**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| **UNITED STATES FIRE INSURANCE COMPANY and THE NORTH RIVER INSURANCE COMPANY,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| v. | ) ) ) | **Civil Action No. 23-cv-40044-DJC** |
| **PETERSON'S OIL SERVICE, INC. HOWARD WOOD PETERSON, JR., KRISTEN PETERSON HALUS, and and SHARON PETERSON,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

---

**MEMORANDUM AND ORDER**

CASPER, J.                                                                                             June 17, 2024

**I.      Introduction**

Plaintiffs United States Fire Insurance Company ("U.S. Fire") and The North River Insurance Company ("North River") (collectively, "Plaintiffs") filed this lawsuit against Defendants Peterson's Oil Service, Inc. ("Peterson's Oil"), Howard Wood Peterson, Jr. ("Peterson"), Kristen Peterson Halus and Sharon Peterson (collectively, the "Peterson Defendants"), seeking a declaratory judgment that Plaintiffs have no duty to defend or indemnify the Peterson Defendants for liability arising from a class action in state court under various theories. D. 1. The class plaintiffs in the state court litigation intervened (the "Intervenors"). D. 35. Plaintiffs have now moved for summary judgment. D. 32. For the reasons stated below, the Court DENIES the motion.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 322–23 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  See Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The Court draws the following facts from the parties' statements of undisputed facts and accompanying exhibits.  D. 31; D. 32; D. 43; D. 44; D. 47.  These facts are undisputed unless otherwise noted.

### A.     The Relevant Insurance Policies

Plaintiffs issued insurance policies to Peterson's Oil for five years.  D. 43 ¶ 1; D. 47 ¶ 1; see, e.g., D. 31-1–31-10.   North River issued a primary commercial general liability policy (a "Primary Policy") covering July 5, 2011 to July 5, 2012 and five commercial umbrella liability ("Umbrella Policies") policies covering July 5, 2011 to July 5, 2016.  D. 43 ¶¶ 1–2, 8; D. 47 ¶ 1–

2, 8.[1]  U.S. Fire issued four Primary Policies covering the period July 5, 2012 through July 5, 2016.
D. 43 ¶¶ 1–2; D. 47 ¶ 1, 8.

### 1.    The Primary Policies

The Primary Policies insure Peterson's Oil for "'bodily injury' or 'property damage' only if:  (1)   An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  D. 43 ¶ 6; D. 47 ¶ 6.  The Primary Policies provide liability up to a limit of $1,000,000 per occurrence and $2,000,000 as a general aggregate limit.  D. 43 ¶ 3; D. 47 ¶ 3.  An endorsement to the Primary Policies titled "Limited Coverage – Failure to Supply" limits the amount covered for "property damage arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam" to $250,000 "regardless of the number of insureds, claims made or 'suits'" brought."  D. 43 ¶ 5; D. 47 ¶ 5.

### 2.    The Umbrella Policies

The Umbrella Policies provide additional coverage in the amount of $15,000,000 per occurrence and in the aggregate if "'Property Damage' is caused by an 'Occurrence.'"  D. 43 ¶¶ 9–10; D. 47 ¶¶ 9–10.   "Property Damage" and "Occurrence" are defined similarly in the Umbrella Policies as they are in the Primary Policies.  D. 43 ¶¶ 15, 16; D. 47 ¶¶ 15, 16.[2]  The Umbrella Policies contain several exclusions and limitations that are potentially relevant to the present case.

---

[1]  The Court notes that the paragraph numbering in Intervenors' response to the statement of material facts skips paragraph 8.  The text of Intervenors' response between paragraphs 7 and 9 make clear that Intervenors do not dispute paragraph 8 as to the number or dates of the policies issued.  D. 47 at 4.

[2]  Occurrence is defined in the Umbrella Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions that results in 'Bodily Injury' or 'Property Damage' that is not expected or intended by the Insured."  See, e.g., D. 31-6 at 24.

First, the Umbrella Policies from July 5, 2011 to July 5, 2015 contain a "Failure to Supply Exclusion" which excludes coverage "'Property Damage' arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam."  D. 43 ¶ 11; D. 47 ¶ 11.

Second, the Umbrella Policies from July 5, 2014 to July 5, 2016 contain a "Failure to Supply Limitation" which excludes "'Property Damage' . . . arising out of the failure of any Insured to provide an adequate supply of gas, oil, electricity, steam, or any other form of energy, or water."  D. 43 ¶ 12; D. 47 ¶ 12.  This exclusion expressly "does not apply to . . . 'Property Damage' that is covered by 'Underlying Insurance' for the full limit scheduled as 'Underlying Insurance by this policy."  D. 43 ¶ 12; D. 47 ¶ 12.

Finally, the Umbrella Policies in effect from July 5, 2012 to July 5, 2016 contain a "Sublimited Coverage Exclusion" which excludes coverage for property damage "resulting from, arising out of or in any way related to injury, damage, cost or expense for which coverage under any 'Underlying Insurance' is subject to a 'Sublimit.'"  D. 43 ¶ 13; D. 47 ¶ 13.  A "Sublimit" is defined as "any limit of insurance under any 'Underlying Insurance' applicable to a specific hazard, peril, cause or injury or damage which is less than limits of liability applicable in general in such 'Underlying Insurance.'"  D. 43 ¶ 13; D. 47 ¶ 13.

### B.    The Underlying Litigation

On or about March 15, 2019, the Intervenors sued the Peterson Defendants in state court, alleging that the Peterson Defendants sold Intervenors fuel for home heating which contained more than 5% biodiesel.  D. 31-12 ¶ 28; D. 43 ¶¶ 17, 20–22; D. 47 ¶¶ 17, 20–22.  Intervenors further allege that fuel containing more than 5% biodiesel does not meet industry standards and caused damage to Claimants' home heating equipment.  D. 31-12 ¶¶ 28, 132, 159, 161, 211, 217; D. 43 ¶¶ 20–27; D. 47 ¶¶ 20–27; D. 31-12 ¶ 28.  The Peterson Defendants allegedly did not fully disclose the presence of biodiesel in their fuel, despite knowing the risk posed by high-biodiesel blended

4

fuel.  D. 31-12 ¶¶ 157–62, 207, 215; D. 43 ¶¶ 24–27; D. 47 ¶¶ 24–27.  Plaintiffs are defending the Peterson Defendants in the underlying action pursuant to a reservation of rights.  D. 43 ¶ 18; D. 47 ¶ 18.

The fact discovery deadline in the underlying action has passed.  D. 43 ¶ 31; D. 47 ¶ 31.[3] As part of discovery, Peterson was deposed in his individual capacity and as a designee of Peterson's Oil under Fed. R. Civ. P. 30(b)(6).  D. 31-13; D. 31-14; D. 43 ¶ 31; D. 47 ¶ 31.  Peterson testified that he started blending biodiesel into home heating oil in 2012 because "[c]limate change was becoming a matter of life and death for most people who lived in the Commonwealth of Massachusetts."  D. 43 ¶ 32; D. 47 ¶ 32.  The parties do not dispute that "Peterson intentionally blended biodiesel into its fuel."  D. 43 ¶ 32; see D. 47 ¶ 32 (disputing "aspects of Plaintiffs' characterizations as written" and "that testimony is complete," but noting "that Howard Peterson's testimony speaks for itself").

## IV.    Procedural History

Plaintiffs instituted this action on April 13, 2023.  D. 1.  Plaintiffs have now moved for summary judgment.  D. 30.  The Court heard the parties on the pending motion, D. 30, and took the matter under advisement.  D. 52.

## V.    Discussion

### A.    Scope of the Duty to Defend and Duty to Indemnify

It is well-settled Massachusetts law that an insurer's duty to defend is broader than its duty to indemnify.  Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 403 (1st Cir. 2009).

---

[3] The Court acknowledges that the Peterson Defendants' and Intervenors' responses to Plaintiffs' statement of material facts indicate that although fact discovery deadline has passed, as of October 31, 2023, not all discovery is complete.  D. 43 ¶ 31; D. 47 ¶ 31 (listing outstanding fact discovery matters).

To determine whether the insurer has a duty to defend, the Court must compare the facts alleged in the underlying complaint against the provisions of the insurance policy.  Id.  "[I]f the allegations of the [underlying] complaint are reasonably susceptible of an interpretation that they state a claim covered by the terms of the insurance policy," then the insurer has a duty to defend.  HDH Corp. v. Atl. Charter Ins. Co., 425 Mass. 433, 436 (1997).  So long as the insurer is obliged to defend one count of the underlying complaint, "the insurer must defend the insured on all counts, including those that are not covered."  Mount Vernon Fire Ins. Co. v. Visionaid, Inc., 477 Mass. 343, 351 (2017).  By comparison, the duty to indemnify "arises only after the insured's liability has been established."  Wilkinson v. Citation Ins. Co., 447 Mass. 663, 671 (2006).  Typically, a declaratory judgment on the insurer's duty to indemnify "is not yet ripe" if "the underlying action has not determined liability or adjudicated factual disputes."  See State Farm Fire & Cas. Co. v. Pike, 389 F. Supp. 3d 94, 99 (D. Mass. 2019); see John Moriarty & Assocs., Inc. v. Zurich Am. Ins. Co., 102 Mass. App. Ct. 474, 489 (2023) (explaining that request for declaratory relief was premature because it "may turn on facts proved in the underlying action").

Once an insurer undertakes to defend its insured, as Plaintiffs have done here, the insurer "may not unilaterally withdraw a defense based on new facts outside the scope of the underlying complaint."  Medmarc Cas. Ins. Co. v. Harvard Bioscience, Inc., No. 2184-cv-02093-BLS2, 2022 WL 1416489, at *6 (Mass. Super. Jan. 24, 2022).  When the underlying complaint is reasonably susceptible of an interpretation that coverage exists, but the insurer wishes to withdraw coverage based on newly developed facts, one appropriate course is for the insurer to seek a declaratory judgment of no coverage—and thus no duty to indemnify or continue the defense—in a separate action where the interested parties are represented, as Plaintiffs have done here.  D. 1; Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 323 (1983); see Lumbermens Mut. Cas. Co. v.

Belleville Indus., Inc., 407 Mass. 675, 686 (1990).   The insurer "can use the information derived in discovery in the underlying action to absolve itself of the duty to defend." Arch Specialty Ins. Co. v. Colony Ins. Co., 590 F. Supp. 3d 395, 414 (D. Mass. 2022); Sterilite, 17 Mass. App. Ct. at 323 (explaining that insurer can "get clear of the duty from and after the time when it demonstrates with conclusive effect on the third party that as matter of fact—as distinguished from the appearances of the complaint and policy—the third party cannot establish a claim within the insurance").   Massachusetts courts will only relieve an insurer from the duty to defend, however, (1) "where there is undisputed, readily knowable, and publicly available information in court records that demonstrates that the insurer has no duty to defend"  or  (2) "where there is an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action." Metro. Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 358 (2011) (internal quotation marks omitted) (quoting Billings v. Commerce Ins. Co., 458 Mass. 194, 200 n.8, 205 (2010)).

### B.   Occurrence (Count I)

Plaintiffs first assert that they no longer have a continuing duty to defend the Peterson Defendants in the underlying litigation, because discovery has demonstrated that the Intervenors' damage was not caused by a covered "occurrence," but instead by Peterson's intentional act of mixing biofuel with heating oil.  D. 33 at 16–19.  Coverage thus turns on the interpretation of the term "occurrence."

The interpretation of an insurance policy is a question of law for the Court.  See Ruggerio Ambulance Serv. v. Nat'l Grange Mut. Ins. Co., 430 Mass. 794, 797 (2000).   The Court "construe[s] an insurance policy under the general rules of contract interpretation, beginning with the actual language of the polic[y], given its plain and ordinary meaning." Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 91 (1st Cir. 2019) (quoting AIG

Prop. Cas. Co. v. Cosby, 892 F.3d 25, 27 (1st Cir. 2018)).  While any ambiguity "is strictly construed against the insurer," id. (quoting Morrison, 460 Mass. at 362–63), "provisions [that] are plainly and definitely expressed in appropriate language must be enforced in accordance with [the policy's] terms," High Voltage Eng'g Corp. v. Fed. Ins. Co., 981 F.2d 596, 600 (1st Cir. 1992) (quoting Stankus v. N.Y. Life Ins. Co., 312 Mass. 366, 369 (1942)).  Under Massachusetts law, "the insured bears the 'initial burden of showing that the case involves a generally covered risk under the policy.'"  Easthampton Congregational, 916 F.3d at 91 (quoting Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 247 (1st Cir. 2013)).  The burden then "shifts such that the insurer must demonstrate that an exclusion precludes coverage."  Id.  Once the insurer does so, "the burden shifts back to the insured[] to show an exception to the exclusion holds sway."  Id. at 92 (quoting Stor/Gard, Inc., 717 F.3d at 247).

According to the Policies, an occurrence is "an accident."  D. 43 ¶ 6; D. 47 ¶ 6; see D. 43 ¶ 15; D. 47 ¶ 15.[4]  In the context of insurance disputes, Massachusetts courts define an "accident" as "an unexpected happening without intention or design."  Hanover Ins. Grp., Inc. v. Raw Seafoods, Inc., 91 Mass. App. Ct. 401, 405 (2017) (quoting Liberty Mut. Ins. Co. v. Tabor, 407 Mass. 354, 358 (1990)).  The term is broadly construed and encompasses reckless conduct.  Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83–86 (1984).  "[T]he resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur."  Id. at 84.[5]

---

[4] The parties agree that the outcome in this case is not impacted by variations in the definition of occurrence between the Primary and Umbrella Policies.  D. 42 at 10 n.4; see D. 33 at 16.

[5] Plaintiffs object that Abernathy relates to the application of an exclusion for expected or intended injury, a grounds for denying coverage which Plaintiffs pled in their complaint, but for which they have not sought summary judgment.  D. 50 at 11–12.  The Court does not find this distinction

Here, based on Peterson's deposition testimony, none of the parties dispute that Peterson's blending of biodiesel with heating fuel was a volitional act. D. 33 at 13, 18–19; D. 42 at 12; D. 46 at 10. The blending of biodiesel with heating fuel is not, however, the type of conduct that inherently demonstrates a specific intent to cause property damage. Cf. Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 399–400 (1990) (concluding that injury caused by employees' sexual abuse and rape would not be covered by school's insurance policy because such acts are "inherently injurious"); City of Newton v. Krasnigor, 404 Mass. 682, 686–88 (1989) (concluding that, as a matter of law, insured youth intended to cause some property damage to the school where he "broke into school, placed matches in several boxes of books, lit those boxes of books, and left the school while several small fires were blazing"). Thus the question is whether Peterson blended biodiesel with substantial certainty that the damage to Intervenors' heating system would occur.

Peterson testified that he tested the biodiesel on his own home heating equipment and Peterson's Oil heating equipment without issue when he made the decision to begin blending biodiesel in 2012. D. 31-14 at 7–8. The Peterson Defendants' interrogatory responses also take the position that heating high-biodiesel fuel is not harmful to heating equipment. See D. 44-3 at 14. Moreover, none of the evidence in the record presently before the Court suggests that the Peterson Defendants were aware of a pattern of heating equipment damage between the July 2012 to July 2016 policy periods. Compare Raw Seafoods, 91 Mass. App. Ct. at 406 (denying insurer's summary judgment motion where damage to seafood was result of unknown cause and no similar

persuasive as Massachusetts courts analyzing "accident" in the context of an "occurrence" have cited and applied the test in Abernathy, including Smartfoods. Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 35 Mass. App. 239, 242 (1993) (distinguishing Abernathy); see Fells Acres, 408 Mass. at 399. Abernathy itself "conclude[d] the word 'expected' brings no change to our well-defined concept of 'accident.'" Abernathy, 393 Mass. at 86.

instance of damage had occurred in seventeen years insured had operated seafood processing business), with Utica Mut. Ins. Co. v. Hamel, 46 Mass. App. Ct. 622, 625–26 (1999) (concluding that damage to building caused by regular spills from insured's workspace was "inherently predictable" where spills were "continuous and extensive" and government chemist had cited insured for failure to comply with waste water treatment regulation).  Although the Fifth Amended Complaint alleges that multiple Peterson's Oil customers reported damage to their home heating systems, the earliest alleged report occurred in late 2018, D. 31-12 ¶¶ 29–31, 36–37, 50–58, 62–74, 113, after Plaintiffs' policies were no longer effective, D. 43 ¶¶ 1–2, 8; D. 47 ¶ 1–2, 8.  In light of this record, the Peterson Defendants have created at least a genuine dispute of material fact as to whether Peterson was substantially certain that blended heating oil would cause heating equipment failure during the effective period of the policies.  See Innovative Mold Solutions, Inc. v. All American Ins. Co., 15-cv-40010-TSH, 2016 WL 3814774, at *5–6 (D. Mass. 2016) (concluding that damages were potentially caused by an occurrence even though insured intentionally changed the composition and application of epoxy in products sold to plaintiff, where insured did not specifically intend to harm plaintiff and facts did not show with "substantial certainty" that damage would result).

Plaintiffs nevertheless analogize Peterson's conduct to two categories of conduct which courts have deemed non-accidental for the purposes of insurance.  First, Plaintiffs cite construction cases holding that a contractor's "faulty workmanship fails to constitute an accidental occurrence in a commercial general liability policy."  Admiral Ins. Co. v. Tocci Bldg. Corp., 594 F. Supp. 3d 201, 210–11 (D. Mass. 2022) (concluding that damage to underground utilities, sheetrock, concrete slab and woodframing caused by insured's improper installation were not covered by policy because damage to the construction project itself was not "property damage" and faulty

workmanship was not accidental occurrence); Friel Luxury Home Constr., Inc. v. ProBuilders Specialty Ins. Co. RRG, No. 09-cv-11036-DPW, 2009 WL 5227893, at *5 (D. Mass. Dec. 22, 2009). Even where the claim is based upon faulty workmanship, however, Massachusetts courts construe "accident" to encompass "[u]nintended and unforeseen consequences . . . even of intentional acts." Wade v. Maryland Cas. Co., No. 0500267, 2007 WL 3014749, at *3 (Mass. Super. Mar. 20, 2007) (quoting Tabor, 407 Mass. at 358) (concluding replacement of subfloor and repainting of first floor was unforeseeable consequence of "calculated business decision" to improperly install flooring and thus within definition of "accident" for insurance coverage purposes). As this Court has previously noted, "although [f]aulty workmanship, alone, is not an 'occurrence,' insurance coverage would extend to faulty workmanship which causes an accident." Gen. Cas. Co. of Wisconsin v. Five Star Bldg. Corp., No. CIV.A. 11-30254-DJC, 2013 WL 5297095, at *5 (D. Mass. Sept. 19, 2013) (internal quotation marks omitted) (alteration in original) (quoting Davenport v. U.S. Fid. & Guar. Co., 56 Mass. App. Ct. 1109, 2002 WL 31549391, at *1 (2002)).

The Court is skeptical that Peterson's blending of heating fuel with biodiesel is analogous to damage caused by faulty workmanship, as opposed to damage caused by a defective product. See Innovative Mold, 2016 WL 3814774 at *5–6 (concluding that damages were potentially caused by an occurrence where insured intentionally changed the composition and application of epoxy in power supplies sold to plaintiff). Even if the Court were to consider Peterson's conduct analogous to faulty workmanship, the Peterson Defendants' interrogatory responses indicate that they have produced or plan to produce some evidence in the underlying litigation that the blending of biodiesel was not the sole cause of all Intervenors' property damage. D. 44-1 at 17, 19 (asserting that the Peterson Defendants expect to provide expert testimony that heating equipment "can

experience issues with fuel gelling during periods of extreme cold, even if that fuel does not contain any biodiesel content" and that accumulated sludge can cause similar heating issues); D. 44-2 at 15, 17–18 (asserting that accumulation of sludge in old fuel tanks can cause heating issues and that certain Intervenors had added antifreeze to their heating system and replaced a thermostat, suggesting that their heating issues were not caused by Peterson Oil's fuel); see Five Star, 2013 WL 5297095, at *4–5 (concluding that rain damage constituted an occurrence even if alleged faulty workmanship in roof contributed to the leaking). Moreover, for the reasons explained above, damages stemming from "faulty workmanship" are not categorically barred from coverage and the undisputed evidence does not show that the Peterson Defendants were substantially certain that the blending of biodiesel with heating fuel would damage Intervenors' heating systems during the relevant time period.

Second, Plaintiffs cite cases excluding claims for breaches of contract and misrepresentation from the definition of accidental occurrences. See, e.g., NWS Corp. v. Hartford Fire Ins. Co., No. 12-300113-KPN, 2013 WL 2325175, at *2, 4–5 (D. Mass. Apr. 25, 2013) (concluding that no accident occurred where insured deliberately sold programming to its clients at lower price than set forth in contract with Direct TV and fraudulently concealed its conduct); Smartfoods, 35 Mass. App. Ct. at 241–42 (concluding that insured's termination of distribution agreement would have inevitably caused some substantial harm to distributors, and thus was not occurrence); Vecchia v. Gage, No. 99-01572-E, 1999 WL 1441960, at *3 (Mass. Super. Ct. Nov. 19, 1999) (holding that where there were claims for breach of contract and fraud where insured hid information about fire-related repairs from homebuyers, there was no property damage caused by an occurrence). Plaintiffs assert that "[w]hen Peterson made the business decision to change

its product and deviate from its contract standards, '[s]ome degree of intangible harm' had to be expected." D. 33 at 19 (quoting <u>Smartfoods</u>, 35 Mass. App. Ct. at 242); <u>see</u> D. 51 at 8–10.

The Court acknowledges that Intervenors' Fifth Amended Complaint alleges facts that may support a breach of contract or fraud claim, including that the Peterson Defendants lied to Intervenors regarding the content of their heating oil while knowing of the lowered efficiency and higher failure risk posed by their high biodiesel blend. <u>See, e.g.</u>, D. 31-12 ¶¶ 208, 216. Unlike the underlying disputes in <u>Smartfoods</u> and <u>NWS Corp.</u>, however, the underlying litigation between the Peterson Defendants and Intervenors includes a negligence claim. <u>See id.</u> ¶¶ 247–55. Plaintiffs urge the Court to disregard the negligence claim as "inconsistent with the facts before this Court." D. 50 at 11 (citing <u>Friel Luxury</u>, 2009 WL 5227893 at *6 (explaining that court should focus on source of alleged harm in underlying claim, rather than theory of liability, in case involving faulty workmanship)). The undisputed evidence that the Peterson Defendants knew that they were blending biodiesel into fuel does not necessarily mean that the Peterson Defendants knew of the risk to consumers. Intervenors may well prevail on their negligence claim because the Peterson Defendants should have known of an unreasonable risk while failing to prove that the Peterson Defendants breached the terms of their contracts with Intervenors or had the requisite scienter to commit fraud. <u>See</u> D. 44-1 at 4–5; <u>see also</u> <u>Zurich Am. Ins. Co. v. Elec. Maine LLC</u>, 325 F. Supp. 3d 198, 202 (D. Me. 2018) (applying Maine law and concluding that duty to defend existed where negligence was pled in alternative to intentional torts), <u>aff'd</u>, 927 F.3d 33 (1st Cir. 2019). Plaintiffs must continue to defend the entire underlying action so long as they are still obliged to defend the negligence claim. <u>See</u> <u>Visionaid</u>, 477 Mass. at 351. Accordingly, Plaintiffs cannot establish "an undisputed extrinsic fact that takes the case outside the coverage" and have a continuing duty to defend. <u>Compare</u> <u>Morrison</u>, 460 Mass. at 364 (concluding that where defendant's guilty plea in

13

criminal case was merely evidence that his acts were intentional and criminal in civil litigation, insurer could not establish undisputed basis for excluding coverage and had continuing duty to defend defendant in underlying civil action), with Conway Chevrolet Buick, Inc. v. Travelers Indem. Co., 136 F.3d 210, 214 (1st Cir. 1998) (concluding that insurer was entitled to withdraw once underlying court issued partial summary judgment against negligence-based claims and "left no basis for coverage").  For the same reason, it would be premature for the Court to rule on Plaintiffs' duty to indemnify the Peterson Defendants until the disputed facts in the underlying litigation are resolved.  See John Moriarty & Assocs., 102 Mass. App. Ct. at 489.

Accordingly, the Court denies summary judgment to Plaintiffs on their claim that Intervenors' property damage was not caused by an occurrence.

### C.    Failure to Supply (Count VIII)

#### 1.    Plaintiff's Motion for Summary Judgment

Plaintiffs argue that even if Intervenors' damage is covered as caused by an accidental occurrence, such coverage is limited to $250,000 per policy period under the Primary Policies.  D. 33 at 20–22.  The "Limited Coverage - Failure to Supply" endorsement in the Primary Polices limits coverage for "**property damage** arising out of the failure of any Insured to adequately supply, gas, oil, water, electricity or steam" to $250,000 in each policy year.  See, e.g., D. 31-1 at 269 (emphasis in original).  The Umbrella Policies exclude from coverage any property damage "arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam" or "to provide an adequate supply of gas, oil, electricity, steam, or any other form of energy, or water, to any person or entity."  See, e.g., D. 31-6 at 60; D. 31-9 at 73.[6]  Finally, the Umbrella

---

[6] The Court notes that certain Umbrella Policies refer to failure "to provide an adequate supply of [fuel]" while others use the phrase "to adequately supply."  Compare D. 31-6 at 60, with D. 31-9 at 73.  The parties treat this difference in phrasing as inconsequential and make no argument that the exclusionary language in the later Umbrella Policies should be treated differently than the

Policies effective between July 2012 and July 2016 included a "Sublimited Coverage  Exclusion" which excludes Umbrella Policy coverage for losses "subject to a 'Sublimit'" in the associated Primary Policy.   D. 31-10 at 33 (defining Sublimit as "any limit of insurance under any 'Underlying Insurance' applicable to a specific hazard, peril, cause or injury or damage which is less than limits of liability applicable in general in such 'Underlying Insurance'"); see D. 31-10 at 50–51, 70 (defining and identifying Primary Policy as "Underlying Insurance").   The combined effect of these limitation endorsements and exclusions (the "Failure to Supply provisions") is to exclude coverage under the Umbrella Policies entirely and limit coverage to $250,000 per year under the Primary Policies for property damage arising out of Peterson Oil's failure "to adequately supply" heating fuel.

 As previously noted, "the insurer bears the burden of demonstrating that an exclusion exists that precludes coverage." Cosby, 892 F.3d at 27.  Massachusetts courts have not definitively stated whether the burden is the same for endorsements that limit, rather than exclude insurance, and it appears that jurisdictions disagree on this point.  Kamerer v. Unum Life Ins. Co. of Am., 334 F. Supp. 3d 411, 427 (D. Mass. 2018) (collecting cases and describing issue as "unsettled").  The Court notes that "'[l]imitation' is not synonymous with 'exclusion.'" Performance Trans., Inc. v. Gen. Star Indem. Co., 983 F.3d 20, 26 (1st Cir. 2020).  Nevertheless, the Court concludes, consistent with the reasoning in Kamerer, that it is appropriate to shift the burden to Plaintiffs to establish both the application of the Failure to Supply provisions that limit coverage and those that exclude coverage entirely, as both sets reduce the coverage the Peterson Defendants would

---

earlier ones.  See D. 33 at 21 (asserting that "Failure to Supply Limitation" endorsement in last two Umbrella Policies is "identical" to failure-to-supply provisions in other policies, except for additional preclusion of sublimits); D. 42 at 16 n.11 (asserting that "minor deviation in language does not alter the analysis" of the Failure to Supply Exclusions).

otherwise receive.  Kamerer, 334 F. Supp. 3d at 428 (concluding that "better approach is to shift the burden to the [insurers]"); see Phan v. Metro. Life Ins., Co., No. CIV.A. 12-11490-DPW, 2014 WL 595763, at *4 n.7 (D. Mass. Feb. 18, 2014) (applying Massachusetts law and quoting Gen. Acc. Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc., 716 A.2d 751, 757 (R.I. 1998), for proposition that "[t]he insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment").

For the reasons explained above, Plaintiffs bear the burden of proving the Failure to Supply provisions apply to the underlying litigation.  The parties dispute the meaning of the terms "adequate" and "supply" within the various Failure to Supply provisions.  The Peterson Defendants argue that the placement of the modifier "adequate" or "adequately" before "supply" rather than before the list of associated fuel and utilities to be supplied, indicates that "adequate" modifies only the supply, or amount, of fuel rather than the adequacy of the product itself.  D. 42 at 16–17.  In the same vein, Intervenors emphasize the connection between the term "supply" and the quantity or amount of goods.  D. 46 at 17 (citing Supply, Black's Law Dictionary (11th ed. 2019)).[7]  Plaintiffs counter with various dictionary definitions showing that adequacy can refer to both the quantity and quality of goods.  D. 50 at 12–13 (collecting definitions).  Under Plaintiffs' interpretation, the delivery of heating oil which does not meet contract specifications or is unsuitable for use in customers' home heating system constitutes a failure to adequately supply oil.  D. 33 at 21.

The parties rely upon different cases to support their preferred interpretation.  The Peterson Defendants and the Intervenors cite Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F.

---

[7] Plaintiffs object that the definition in Black's Law Dictionary defines "supply" as a noun rather than as a verb.  D. 50 at 14. As previously noted, some of the relevant policies use "supply" as a noun and some as a verb.  Compare D. 31-1 at 270, and D. 31-6 at 60, with D. 31-9 at 73.

Supp. 447 (D.N.J. 1998), as an example of a case where an insured town's failure to deliver a sufficient amount of water to a condo development was not covered under a failure to supply exclusion.  Id. at 449, 456.  The Court agrees with Plaintiffs that Elizabethtown is of limited help in the present case because the exclusions in Elizabethtown explicitly target inadequate quantities of water.  Id. at 451 (quoting that "Property damage shall not include damage arising out of inability of the insured to supply gas and/or electricity or water in quantities sufficient to meet the demands of the insured's customers").  Moreover, it does not appear that the question of whether the exclusion in Elizabethtown could apply to inadequate quality, as opposed to quantity, was not raised.

Plaintiffs' citation to Washington Energy Co. v. Century Sur. Co., 407 F. Supp. 2d 680 (W.D. Pa. 2005), is more factually analogous in that it involves a similar failure to supply exclusion and an insured who supplied a third-party with contaminated natural gas and thus caused the third-party's gas line equipment to become un-usable.  Id. at 683, 686.  The court stated that "it appears that [the similar Failure to Supply exclusion] is meant to apply in a breach of contract or warranty situation."  Id. at 702.  Plaintiffs assert that this suggests that the failure to supply provision applies to situations in which the insured does not supply the contracted for product.  D. 33 at 20–21.  The insurer in Washington Energy, however, "abandoned its reliance on the Failure to Supply exclusion to deny coverage."  Washington Energy, 407 F. Supp. 2d at 702.[8]  Thus Washington Energy's analysis of the Failure to Supply exclusion is dicta and offers little to no guidance as to what would constitute a pertinent "breach of contract or warranty situation" or if there are other situations which the Failure to Supply exclusion could reach.

---

[8] Washington Energy explained that the failure to supply exclusion could not apply because there was no evidence that the third-party sought damages stemming from a breach of contract or warranty.  Washington Energy, 407 F. Supp. 2d at 702.

Ultimately, the Court concludes that the placement of the "adequately" or "adequate" modifier immediately before the term "supply" in the Failure to Supply provisions as at least ambiguous.  The plain meaning of the term "supply" is related to quantity.  Supply, Black's Law Dictionary (11th ed. 2019).  While it is possible to read "adequately supply" to refer to quality and quantity, reasonably intelligent minds could differ as to the proper interpretation.  As Intervenors note, D. 46 at 18, elsewhere in the Primary Policies, Plaintiffs have made explicit when a provision refers to the insufficient quality of Peterson's fuel and could have done so here.  See e.g., D. 31-1 at 169 (excluding from coverage "'Personal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement'").  Even if the Court were to adopt the suggestion in Washington Energy and apply the Failure to Supply Provisions to a breach of contract or warranty claim, the record here does not show that Intervenors' claim is necessarily a breach of contract claim rather than a negligence claim.  D. 44-1 at 4–5.  The Court thus construes this ambiguous provision in favor of the insured.  See Easthampton Congregational, 916 F.3d at 92–93.

Accordingly, the Court denies Plaintiffs' motion for summary judgment on the basis that coverage is limited to $250,000 per policy year.

### 2. Sua Sponte Summary Judgment for the Peterson Defendants

Intervenors urge this Court to grant sua sponte summary judgment in favor of the Peterson Defendants and against Plaintiffs that "the failure to supply endorsement does not cap coverage at $250,000." D. 46 at 3, 19-20.

"A district court has the legal power to render 'summary judgment . . . in favor' of the party opposing a summary judgment motion 'even though he has made no formal cross-motion under rule 56.'"  Nat'l Expositions, Inc. v. Crowley Mar. Corp., 824 F.2d 131, 133 (1st Cir. 1987) (alteration in original) (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice and

Procedure § 2720, at 29–30 (1983)); see In re Scubla, 631 B.R. 262, 273 (B.A.P. 1st Cir. 2021).

The court may only exercise this power, however, if (1) "the discovery process [is] sufficiently

advanced that the parties have enjoyed a reasonable opportunity to glean the material facts" and

(2) "the district court [has] provide[d] the targeted party appropriate notice and a chance to present

its evidence on the essential elements of the claim or defense." Sanchez v. Triple-S Mgmt., Corp.,

492 F.3d 1, 7 (1st Cir. 2007) (internal quotation marks omitted) (quoting Berkovitz v. Home Box

Office, Inc., 89 F.3d 24, 29 (1st Cir. 1996)).  "Notice in this context means that the losing party had

reason to believe the court might reach the issue and received a fair opportunity to put its best foot

forward." Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1561 (1st Cir. 1989).

Here, Plaintiffs themselves moved for summary judgment on the application of the Failure

to Supply provisions as to the Peterson Defendants' conduct, implicitly taking the position that no

further discovery was necessary for this Court to construe and apply the Failure to Supply

provisions.  D. 50 at 15.  Plaintiffs had the opportunity to present their best arguments that the

Failure to Supply provisions unambiguously limit and exclude coverage in the present case, D. 33,

and to respond to Intervenors' argument regarding summary judgment for Peterson Defendants in

their reply memorandum.  D. 50 at 17; D. 51 at 16-18.  On reply, Plaintiffs challenge whether

summary judgment is "*sua sponte*" where it is issued at the request of a party and assert that

"Intervenors did not-cross-move for summary judgment, and make no effort to address or satisfy

the summary judgment standard." D. 50 at 17.  This Court's authority to issue summary judgment

against Plaintiffs is clear, regardless of whether a formal cross motion has been filed.  See Nat'l

Expositions, 824 F.2d at 133; Ambit Corp. v. Delta Airlines, Inc., 707 F. Supp. 2d 74, 78 (D. Mass.

2010).  Plaintiffs have not suggested that there is any extrinsic evidence of Plaintiffs' and the

Peterson Defendants' mutual intent which must be submitted to a factfinder to resolve this

ambiguity, nor that further discovery will uncover any such evidence.  Cf. Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 80 (1st Cir. 2009) (concluding that factual dispute as to insured employer's workflow and injured employee's role should be resolved at trial where such facts were dispositive of whether worker fulfilled "short-term workload conditions").  Unlike the parties' dispute over the construction of "occurrence" and its application to the underlying litigation, no party has identified a factual dispute relevant to the application of the Failure to Supply provision.[9]  The parties agree that the Fifth Amended Complaint alleges that the Intervenors received fuel containing a high-biodiesel blend which caused damage to their home heating systems.  D. 43 ¶¶ 21–22, 24; D. 47 ¶¶ 21–22, 24.  None of the parties suggest that the underlying litigation is actually based on Peterson's failure to supply an adequate quantity of fuel.  After considering the parties' arguments and the undisputed record presented with Plaintiffs' motion for summary judgment, the Court has concluded, as a matter of law, that the Failure to Supply provisions are ambiguous and must be construed against insurer Plaintiffs to apply only to insufficient quantities of heating oil.  No further factual development is necessary and Plaintiffs have asserted no basis on which they can resist summary judgment on this issue.  LSDP 15, LLC v. EAC Organics, Inc., No. 17-10333-RGS, 2018 WL 491660, *3 (D. Mass. Jan. 19, 2018).

---

[9] The Peterson Defendants and Intervenors suggest that further discovery could reveal information regarding a conversation between Peterson and his insurance broker, which they assert constitute waiver or estoppel of the Failure to Supply limitations.  D. 42 at 5, 19; D. 46 at 19.  The Court notes that under Massachusetts law, waiver or estoppel cannot be used to broaden coverage or make an insurance policy cover a risk not within its terms.  See Alan Corp. v. Int'l Surplus Lines Ins. Co., 22 F.3d 339, 342 (1st Cir. 1994) (rejecting waiver and estoppel arguments based on insurance company employee's statement because such theories cannot be used to enlarge scope of coverage coverage).  In any event, the Court is already obliged to resolve ambiguities in favor of the insured, so additional discovery as to this issue which favors the Intervenors and Peterson Defendants would not change the outcome here.

Accordingly, the Court grants summary judgment in favor of the Peterson Defendants on the application of the Failure to Supply provisions as to the underlying litigation.

**VI.     Conclusion**

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment, D. 30, as to the absence of an accidental occurrence (Count I) and as to the application of the Failure to Supply provisions (Counts XIII–IX).  The Court ALLOWS summary judgment in favor of the Peterson Defendants on Counts XIII-IX insofar as the Failure to Supply exclusions do not apply and Plaintiffs must continue to defend the Peterson Defendants in the underlying litigation.

**So Ordered.**

<u>/s Denise J. Casper</u>
United States District Judge