# United States Court of Appeals
## For the First Circuit

────────────

No. 24-1671

UNITED STATES FIRE INSURANCE COMPANY and
THE NORTH RIVER INSURANCE COMPANY,

Plaintiffs, Appellants,

v.

PETERSON'S OIL SERVICE, INC., d/b/a CLEGHORN OIL BY PETERSON
and d/b/a PETERSON OIL; HOWARD WOOD PETERSON, JR., KRISTEN
PETERSON HALUS; SHARON PETERSON; SHEENA MARANDINO; SEAN
MARANDINO; NANCY CARRIGAN; CLAIRE FREDA; KELLEY FREDA;
ALICE HART; ROBERT F. HART; TORRE MASTROIANNI; and
CONGREGATION BETH ISRAEL OF WORCESTER,

Defendants, Appellees.

────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

────────────

Before

Montecalvo, Lipez, and Aframe,
Circuit Judges.

────────────

Kristin V. Gallagher, with whom Frank M. Falcone, Joanna L.
Young, Kennedys CMK LLP, Joan A. Lukey, and Manatt, Phelps &
Phillips, LLP were on brief, for appellants.

Louis M. Ciavarra, with whom AiVi Nguyen, Jared A. Fiore,
Brian J. Edmonds, and Prince Lobel Tye LLP were on brief for
appellees, Peterson's Oil Service, Inc., Howard Wood Peterson,
Jr., Kristen Peterson Halus, and Sharon Peterson.

Jeffrey S. Strom, with whom John Regan, Regan Strom, P.C., Edward Foye, and Arrowood LLP were on brief, for appellees Sheena Marandino, Sean Marandino, Nancy Carrigan, Claire Freda, Kelley Freda, Alice Hart, Robert F. Hart, Torre Mastroianni, and Congregation Beth Israel of Worcester.

---

September 9, 2025

---

AFRAME, <u>Circuit Judge</u>.  This appeal concerns a dispute over whether United States Fire Insurance Company and The North River Insurance Company (together, the "Insurers") must defend their insured, Peterson's Oil Service, Inc., against a class action lawsuit brought by its customers concerning Peterson's sale of heating fuel blended with high amounts of biodiesel.  After initially defending Peterson's in the litigation subject to a reservation of rights, the Insurers filed this action in the U.S. District Court for the District of Massachusetts seeking a judgment declaring that they have no defense or indemnity obligations under the relevant general liability insurance policies.  In ruling on the Insurers' motion for summary judgment, the district court rejected the Insurers' argument that Peterson's intentional decision to alter the chemical composition of its heating oil removed the underlying action from the scope of coverage, ruled that the policies' failure-to-supply limitations did not apply, and ordered the Insurers to continue defending Peterson's in the pending litigation.  We affirm.

**BACKGROUND**

A.    <u>The Underlying Litigation</u>

This coverage dispute arises out of a Massachusetts state court class action brought against Peterson's and three of its officers (collectively, "Peterson's") by a putative class of customers (the "customer-plaintiffs") who say that, for years,

Peterson's supplied them with a biodiesel-blended fuel product that was incompatible with conventional heating systems and less efficient than the ordinary heating oil that they believed they had purchased.  Per the operative complaint,[1] every gallon of fuel that Peterson's supplied between 2012 and 2019 consisted of more than five percent biodiesel -- the maximum amount of biodiesel a fuel blend may contain while still qualifying as ordinary heating oil under relevant industry standards -- and contained an average of thirty-five percent biodiesel between 2015 and 2018.  Peterson's allegedly continued to distribute blended fuel even after receiving numerous complaints from customers reporting heating system failures in 2018, and only early in 2019 began disclosing the high level of biodiesel in its products.  As a result, the customer-plaintiffs assert that they paid more for Peterson's fuel than it was worth, suffered repeated losses of heat, and incurred permanent damage to their heating systems.

The customer-plaintiffs brought five claims against Peterson's under Massachusetts law.  The causes of action include a breach-of-contract claim arising out of Peterson's failure to supply customers with the ordinary heating oil that it had agreed to deliver, a fraud claim for misrepresentations and omissions

---

[1]    The district court based its summary judgment ruling on the allegations set forth in the Fifth Amended Complaint.  Although this pleading has since been amended, the parties agree that the changes are immaterial to the issues on appeal.

made by Peterson's concerning the quality and suitability of its fuel, and a negligence claim based on, among other things, Peterson's failure to exercise reasonable care in delivering heating oil that would efficiently heat customers' homes and not damage their heating equipment

### B.    The Policies

Between July 1, 2011 and July 1, 2016, Peterson's maintained five successive one-year commercial general liability policies (the "primary policies") issued by the Insurers. Each primary policy provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies," so long as the damage was caused by an "occurrence" and took place during the policy period.

The primary policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage," in turn, means "physical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Each primary policy contains a $1 million per occurrence limit and a $2 million general aggregate limit. These limits are subject to various conditions, including a "Failure to Supply" endorsement that limits coverage for "property damage arising out of the

failure of any Insured to adequately supply gas, oil, water, electricity or steam" to $250,000 in each policy year.

Peterson's was also covered under five corresponding umbrella liability policies issued by The North River Insurance Company between July 2011 and July 2016. The umbrella policies provide coverage in the amount of $15,000,000 per occurrence and in the aggregate, subject to certain conditions and exclusions. Like the primary policies, the umbrella policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions that results in . . . '[p]roperty [d]amage' that is not expected or intended by the [i]nsured."

The umbrella policies in effect between July 2011 and July 2015 exclude coverage entirely for property damage arising out of Peterson's failure to "adequately supply gas, oil, water, electricity or steam." The umbrella policies in effect between July 2014 and July 2016 also contain a similar overlapping exclusion for property damage arising out of Peterson's failure "to provide an adequate supply of gas, oil, electricity, steam, or any other form of energy, or water, to any person or entity."[2]

---

[2]     The umbrella policies in effect between July 2012 and July 2016 also contain an exclusion for any losses "subject to a 'Sublimit'" in the associated primary policy, which would include losses subject to the primary policies' Failure to Supply endorsement.

Taken together, the primary and umbrella policies cover Peterson's for property damage caused by an "occurrence," but limit losses that fall within the failure-to-supply provisions to $250,000 per year under the primary policies.

C.    **Proceedings Below**

Subject to a reservation of rights, the Insurers assumed Peterson's defense in the underlying Massachusetts class action brought by the customer-plaintiffs. After substantial discovery in that case, the Insurers invoked the district court's diversity jurisdiction and initiated the instant litigation seeking a declaratory judgment that they have no obligation to continue to defend or indemnify Peterson's in the underlying action. Peterson's disagreed and defended against the federal action; the putative class of customer-plaintiffs intervened and opposed as well.

The Insurers' complaint includes fifteen counts, each identifying a different basis for excluding or limiting coverage of the customer-plaintiffs' claims and associated damages under the relevant policies or Massachusetts law. The Insurers moved for summary judgment on three of those counts, arguing that the damages sought by the customer-plaintiffs were not caused by an "occurrence" under the policies (Count I), or arose from Peterson's failure to "adequately supply" customers with heating fuel, thereby triggering the $250,000 coverage cap under the primary

policies and complete exclusion under the umbrella policies (Counts VIII and IX).

The district court denied the motion. On Count I, the court found that there remained a genuine dispute of material fact about whether Peterson's knew that its blended fuel would damage the customer-plaintiffs' heating equipment during the time in which the relevant policies were in effect. This, according to the court, made it possible that the damages sought in the underlying litigation by way of the negligence count resulted from a covered "occurrence," since Peterson's lack of knowledge would mean the customer-plaintiffs' injuries to their heating equipment arose from an "accident" within the meaning of the policies. The court thus concluded that the Insurers "must continue to defend the entire underlying action" because it remained possible that the customer-plaintiffs could prevail on their negligence claim in that lawsuit. On Counts VIII and IX, the court found that the failure-to-supply provisions were susceptible to multiple interpretations and resolved the resultant ambiguity in Peterson's favor. The court accordingly held the limitations inapplicable and granted Peterson's summary judgment sua sponte on Counts VIII and IX.

The district court thereafter requested that the parties file a joint statement addressing the need for further proceedings on the Insurers' claims. The parties agreed that the Insurers'

duty to indemnify Peterson's -- which they identified as the "remaining claim in this matter" -- could not be decided before resolution of the underlying litigation and jointly requested dismissal of the action without prejudice.  The Insurers also requested the entry of a final judgment on their duty to defend claims.  The court then dismissed without prejudice the "portion of [the Insurers'] complaint" pertaining to indemnification as "not ripe" but declined to enter what it called a "piecemeal" judgment regarding the Insurers' duty to defend.

The Insurers timely appealed.  They now seek reversal of the district court's summary judgment rulings and a judgment declaring that they have no duty to continue defending Peterson's in the underlying action.  Peterson's contends that we lack jurisdiction over this appeal, noting, among other things, that the district court declined to enter final judgment on the duty-to-defend claims and did not order the Insurers to undertake a defense of the action in a manner akin to that which we have previously held to be an appealable injunction.  See W Holding Co. v. AIG Ins. Co.-P.R., 748 F.3d 377 (1st Cir. 2014).  Because the jurisdictional issue is statutory and somewhat complex, and the appeal is more easily resolved against the Insurers on the merits, we assume appellate jurisdiction and proceed to the substance of the arguments.  See Donahue v. Fed. Nat'l Mortg. Ass'n, 980 F.3d 204, 207 (1st Cir. 2020).

## ANALYSIS

### A.    Standard of Review

We review summary judgment decisions de novo, drawing all reasonable inferences from the record "in the light most favorable to the non-moving part[y]."  Certain Interested Underwriters at Lloyd's, London v. Stolberg, 680 F.3d 61, 65 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (alteration in original)).  We will affirm the judgment below if there are no genuine disputes of material fact and the district court's conclusions are correct as a matter of law.  Lionbridge Techs., LLC v. Valley Forge Ins. Co., 53 F.4th 711, 718 (1st Cir. 2022).  The parties agree that Massachusetts law governs the interpretative questions in this diversity action, and "we accept their reasonable agreement."  Id. at 718 n.12 (quoting Suzuki v. Abiomed, Inc., 943 F.3d 555, 561 (1st Cir. 2019)).

The Insurers' lead argument on appeal is that they should be absolved of any duty to defend Peterson's in the underlying action because the customer-plaintiffs' claims are not based on an "occurrence" covered by the policies.  In the alternative, the Insurers argue that the failure-to-supply provisions apply to limit coverage to $250,000 per year under the primary policies. Both contentions require interpreting the relevant policy provisions, raising questions of law that we review de novo.

Zurich Am. Ins. Co. v. Elec. Maine, LLC, 927 F.3d 33, 35 (1st Cir. 2019).  We consider each argument in turn.

### B.  **Duty to Defend**

"In Massachusetts, a general liability insurer owes a broad duty to defend its insured against any claims that create a potential for indemnity." Doe v. Liberty Mut. Ins. Co., 667 N.E.2d 1149, 1151 (Mass. 1996).  The duty to defend "is antecedent to, and independent of, the duty to indemnify," and "is more expansive than [the] duty to indemnify." Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997) (citing Bos. Symphony Orchestra v. Com. Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989)).  It is "the nature of the claim and not the ultimate judgment against the insured that triggers the duty to defend even though the plaintiff may not succeed and the claim may, in fact, be weak or frivolous." Metro. Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 668 (Mass. 2011) (quoting A.A. Sansoucy, Liability Insurance Law in Massachusetts 8 (2d ed. 2008)) (alterations omitted).

For this reason, the duty to defend does not depend on "the facts [ultimately] proven at trial," Bos. Symphony Orchestra, 545 N.E.2d at 1158, but rather hinges "on the facts alleged in the complaint," id., as well as those facts which are "known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint," Billings v. Com. Ins. Co., 936

N.E.2d 408, 414 (Mass. 2010).  If the facts alleged are "reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms," an insurer has a duty to defend.  Id.  Massachusetts operates under an "in for one, in for all" rule such that a general liability insurer "must defend the entire lawsuit if it has a duty to defend any of the underlying counts in the complaint."  Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co., 991 N.E.2d 638, 641 n.11 (Mass. 2013) (quoting GMAC Mortg., LLC v. First Am. Title Ins. Co., 985 N.E.2d 823, 827 (Mass. 2013)).

     To determine whether an insurer has a duty to defend, we consider "what kinds of losses may be proved as lying within the range of the allegations of the [underlying] complaint, and then [] whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy."  Billings, 936 N.E.2d at 415 (quoting Bos. Symphony Orchestra, 545 N.E.2d at 1159).  Any uncertainty as to whether the complaint includes a claim within the policy terms is resolved in favor of coverage.  Deutsche Bank Nat'l Ass'n, 991 N.E.2d at 642.

     Where a complaint triggers coverage, Massachusetts law recognizes two "narrow exceptions" to an insurer's duty to defend.  Metro. Prop. & Cas. Ins. Co., 951 N.E.2d at 668.  First, the insurer may be absolved of its duty to defend if "there is 'undisputed, readily knowable, and publicly available information'

in court records that demonstrates that the insurer has no duty to defend." Id. (quoting Billings, 936 N.E.2d at 417). Second, the insurer may establish that there is "an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action." Id. (quoting Billings, 936 N.E.2d at 414 n.8); see also Sterilite Corp. v. Cont'l Cas. Co., 458 N.E.2d 338, 343 (Mass. App. Ct. 1983) (providing that an insurer may "get clear of the duty" to defend "from and after the time when it demonstrates with conclusive effect on the third party that as matter of fact . . . the third party cannot establish a claim within the insurance").

### i.  Occurrence

Peterson's bears the initial burden of establishing that coverage exists for the underlying litigation under the pertinent policies. See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 39 (1st Cir. 2004) ("The insured bears the initial burden of showing coverage under the policy's insuring agreements." (citing Highlands Ins. Co. v. Aerovox Inc., 676 N.E.2d 801, 804 (Mass. 1997))). As described above, the policies insure Peterson's against liability for property damage incurred during the policy period and caused by an "occurrence," which is defined as "an accident." Though the policies do not specifically define "accident," Massachusetts courts have construed the term "broadly"

when assessing insurance coverage.  _Quincy Mut. Fire Ins. Co._ v. _Abernathy_, 469 N.E.2d 797, 799 (Mass. 1984).

"In its common signification," an accident means "an unexpected happening without intention or design."  _Id._ (quoting _Beacon Textiles Corp._ v. _Emp'rs Mut. Liab. Ins. Co._, 246 N.E.2d 671, 673 (Mass. 1969)).  The Supreme Judicial Court has stated that an accident includes the insured's "volitional act[s]" so long as "the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur."  _Id._  Put differently, the key inquiry is whether the insured "intended or expected to cause the injury in question"; if they did not, the resulting harm caused is an "accident" and is thus an "occurrence."  _Terra Nova Ins. Co._ v. _Fray-Witzer_, 869 N.E.2d 565, 571 (Mass. 2007).

To satisfy its threshold burden, Peterson's asserts that the underlying complaint features a negligence count that alleges accidental property damage to the customer-plaintiffs' heating systems, i.e., property damage caused by an occurrence.  The negligence count is therefore a covered claim, Peterson's argues, and the Insurers must accordingly defend against the entire class action lawsuit under the "in for one, in for all" rule.  _See Deutsche Bank Nat'l Ass'n_, 991 N.E.2d at 642 n.11.

During summary judgment proceedings, the Insurers argued that any suggestion of accidental conduct in the underlying

complaint was affirmatively disproved by discovery in the state-court litigation. Specifically, the Insurers contended that deposition testimony from Peterson's president conclusively established that he made an intentional decision to change the composition of the heating oil Peterson's sold to its customers, and that this fact was "dispositive" for the occurrence inquiry. In other words, the Insurers attempted to invoke one of the aforementioned "narrow exceptions" to the duty to defend for an instance in which there is an "undisputed extrinsic fact that takes the case outside the coverage." Metro. Prop. & Cas. Ins. Co., 951 N.E.2d at 668 (quoting Billings, 936 N.E.2d at 414 n.8).

On appeal, the Insurers switch gears to contend that the district court erred in considering discovery material relating to the intention behind Peterson's decision because the duty to defend must be based solely on the facts alleged in the underlying complaint. The Insurers submit that the district court would have found no duty to defend had it limited its occurrence analysis to just those facts, which include allegations that Peterson's made a strategic choice to supply blended fuel product, even though it knew that this decision could harm customers. Because the customer-plaintiffs' alleged injuries are all traceable to Peterson's intentional conduct of blending the fuel in the face of known harm, the Insurers argue that none of the claims in the underlying litigation are based on a covered "occurrence."

Setting aside any tension between the Insurers' present position and their arguments to the district court, their contentions on appeal lack merit. Even assuming that the district court placed too much weight on the underlying case discovery in its occurrence analysis, the well-pleaded negligence claim in the underlying complaint seeks to recover for property damage caused by a covered "occurrence" and thus provides an independent predicate for the Insurers' continuing duty to defend in the underlying litigation. See Williams v. United States, 858 F.3d 708, 714 (1st Cir. 2017) ("As always, we are also free to affirm on any basis apparent in the record[.]" (internal quotation marks omitted)).

We begin by noting that the underlying complaint does not expressly allege that Peterson's either intended or was substantially certain that its blended fuel product would cause injury to the customer-plaintiffs' heating systems. Arguing otherwise, the Insurers cite to allegations throughout the complaint relating to Peterson's "knowledge of the risks associated with biodiesel." Generously read, these allegations plead that Peterson's may have known information suggesting that adding biodiesel to fuel created a degree of risk of physical harm and yet acted or failed to act without regard to that risk. Put differently, these allegations amount to an assertion that Peterson's acted recklessly in supplying customers with fuel

containing high amounts of biodiesel.  <u>See</u> <u>Sandler</u> v. <u>Commonwealth</u>, 644 N.E.2d 641, 643 (Mass. 1995) (defining recklessness).

Such allegations do not remove the underlying litigation from the ambit of coverage.  Under Massachusetts law, an injury caused by reckless conduct still constitutes an accident:

> Generally, injuries resulting from reckless conduct do not fall into the category of "expected or intended" injuries, but are considered "accidental" and thus are covered under insurance policies.  "Our cases have concluded that an injury is nonaccidental only where the result was actually, not constructively, intended, i.e., <u>more than recklessness</u>."

<u>Worcester Ins. Co.</u> v. <u>Fells Acres Day Sch., Inc.</u>, 558 N.E.2d 958, 970 (Mass. 1990) (quoting <u>Quincy Mut. Fire Ins. Co.</u>, 469 N.E.2d at 800); <u>see also</u> <u>Vappi & Co.</u> v. <u>Aetna Cas. & Sur. Co.</u>, 204 N.E.2d 273, 276 (Mass. 1965) ("Unintended or unforeseen consequences of reckless or negligent acts, and even of intentional acts, at least if not undertaken 'with malice or intent to injure' the person or property hurt may be within the definition of 'accident.'" (citation omitted)).  Other allegations in the complaint suggesting that Peterson's was "aware" that its product was "creating issues for its customers' heating equipment" also fall short of establishing a specific intent to harm for the same reason.

But even if awareness of "issues" sufficed, the complaint does not allege that Peterson's knew about a pattern of

heating equipment damage during the relevant policy periods between July 2011 and July 2016. The district court correctly observed that the earliest customer report of equipment damage identified in the complaint occurred in 2018. There are no specific allegations showing that Peterson's received early and repeated reports of damage prior to then or that it previously understood the nature or extent of any emerging issues with the operation of customer heating systems. Instead, the customer-plaintiffs assert a course of conduct over multiple years, without pinpointing the time at which Peterson's became aware of the alleged consequences that its actions were having on their heating equipment. In similar circumstances, Massachusetts courts have declined to infer intent or substantial certainty of the resulting harm. See Quincy Mut. Fire Ins. Co., 469 N.E.2d at 801-02 (assuming that an insured "was fully aware of the circumstances" when he threw a rock at a passing car did not permit the conclusion that the insured "expected or intended" to cause personal injury to the car's occupants).

   In the absence of express allegations on point, the Insurers assert that we can infer Peterson's intent to cause "some" harm as a matter of law from its decision to "intentionally deviate" from industry standards and the terms of its customer agreements. But even accepting that an insured who knowingly breaches a material term of an agreement expects that the breach

will cause "[s]ome degree of intangible harm," Smartfoods, Inc. v. Northbrook Prop. & Cas. Co., 618 N.E.2d 1365, 1367 (Mass. App. Ct. 1993), does not resolve the present coverage dispute. Rather, Peterson's must have intended or been substantially certain of the type of harm inflicted for those injuries to be deemed non-accidental. See City of Newton v. Krasnigor, 536 N.E.2d 1078, 1081 (Mass. 1989) ("The 'resulting harm' concerns the type of harm inflicted . . . and not the extent of the harm actually sustained.").

Unlike in Smartfoods, the injuries claimed by the customer-plaintiffs are not limited to intangible economic harm, 618 N.E.2d at 1367, but extend to damaged heating equipment. Because we cannot infer that Peterson's intended or expected with substantial certainty to damage customer-plaintiffs' heating systems by supplying fuel that deviated from contractual or industry standards, we reject the Insurers' contention that the complaint's breach of contract allegation eliminates the duty to defend the underlying litigation.

Moreover, as noted by the district court, the customer-plaintiffs may ultimately recover on their negligence claim based on Peterson's failure to deliver efficient heating oil even without proof that Peterson's intentionally breached a contract or engaged in fraud. The negligence count alleges that Peterson's "knew or should have known" that the biodiesel content

in its fuel "would not efficiently heat [customers'] houses and businesses and could harm their furnaces" and "also knew the risks [its] fuel posed to traditional heating equipment."  From there, the underlying complaint includes a negligence theory that Peterson's violated its duty to deliver heating oil that would not damage customer heating equipment.  The negligence count thus seeks, among other things, to remedy an injury to the customer-plaintiffs' tangible property, i.e., the heating systems, caused by Peterson's failure to exercise reasonable care in delivering blended fuel that it "should have known" would cause such damage.

These allegations -- including those concerning Peterson's knowledge of the risks attendant to its blended fuel product -- are consistent with the type of conventional negligence theories that Massachusetts courts have found to fall within the scope of covered "accidental" conduct.  Cf. Worcester Ins. Co., 558 N.E.2d at 970 (finding that complaint alleging defendants "knew or should have known of the assault, rape and sexual molestation of the minor plaintiffs and failed to exercise care to prevent" those acts pleaded "accidental" conduct covered by policy).  The customer-plaintiffs therefore have pleaded an "occurrence" under the policies insofar as they allege that Peterson's negligently damaged their heating equipment by delivering sub-standard oil. Because the underlying complaint "states or roughly sketches a

claim covered by the policy terms," <u>Billings</u>, 936 N.E.2d at 414, we agree with the district court that the Insurers have a continuing duty to defend Peterson's in the underlying litigation.

### ii.  **Failure to Supply**

Having concluded that Peterson's satisfied its "initial burden of showing coverage under the policy's insuring agreements," the burden shifts to the Insurers "to prove the applicability of one or more separate and distinct exclusionary provisions." <u>B & T Masonry Constr. Co.</u>, 382 F.3d at 39.  In this regard, the Insurers bear the burden to show that any coverage in the underlying litigation is limited by the failure-to-supply provisions to $250,000 under the primary policies in each policy period.

As noted above, there are three formulations of the failure-to-supply limitations set forth in the policies.  The primary policies contain the following endorsement:

> **LIMITED COVERAGE -- FAILURE TO SUPPLY**
>
> This insurance applies to:
>
> Bodily injury or property damage arising out of the failure of any Insured to adequately supply gas, oil, water, electricity or steam. However, regardless of the number of Insureds, claims made or "suits" brought; or persons or organizations making claims or bringing "suits"; $250,000 is the most we will pay for all damages in any one policy year for this coverage.

The $250,000 coverage limitation does not apply if the failure to supply results from the sudden and accidental injury to tangible property owned or used by any Insured to procure, produce, process or transmit the gas, oil, water, electricity or steam.

The coverage provided by this endorsement does not apply if the failure to supply was caused by any Insured's inability, however caused, to obtain adequate supplies of gas, oil, water, electricity or steam.

The umbrella policies in effect between 2011 and 2015

each include a similarly worded exclusion:

**FAILURE TO SUPPLY EXCLUSION**

This policy does not apply to "Bodily Injury", or "Property Damage" arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam.

Finally, the umbrella policies in effect between 2014

and 2016 each include the following limitation:

**FAILURE TO SUPPLY LIMITATION**

This policy does not apply to "Bodily Injury", "Property Damage" or "Personal and Advertising Injury" arising out of the failure of any Insured to provide an adequate supply of gas, oil, electricity, steam, or any other form of energy, or water, to any person or entity.

This exclusion does not apply to "Bodily Injury" or "Property Damage" that is covered by "Underlying Insurance" for the full limit scheduled as "Underlying Insurance" by this policy.

The parties' dispute centers on the meaning of "adequately" supply or an "adequate" supply.[3]  Peterson's argues that the quoted words must be read to modify supply, as opposed to the specific products listed in the endorsement, and thus address the adequacy of the amount of product rather than the adequacy of the products themselves.  The customer-plaintiffs argue similarly by citing various dictionary definitions indicating that "supply" connotes quantity.

For their part, the Insurers do not dispute that the failure-to-supply provisions would apply to losses arising out of Peterson's failure to provide enough fuel but submit that they also cover a failure to supply fuel of a sufficient quality.  The Insurers base this argument primarily on definitions showing that "adequate" and "adequately" may refer both to quantity and quality. In other words, the Insurers assert that, because the provisions can be fairly read as referring to either the quantity or quality of the fuel, they should be construed as covering both.

"Under Massachusetts law, we construe an insurance policy under the general rules of contract interpretation,

---

[3]    The Insurers focus mostly on the phrase "adequately supply" as used in the primary policies and do not contend that the slight variations in the language used in the umbrella policies convey any different meaning.  Cf. AIG Prop. Cas. Co. v. Cosby, 892 F.3d 25, 28-29 (1st Cir. 2018) (language used identically in both primary and umbrella policies "carr[ied] identical meaning, calling for identical effect").

beginning with the actual language of the policies, given its plain and ordinary meaning." AIG Prop. Cas. Co., 892 F.3d at 27 (citation modified).  A term is ambiguous when it is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Certain Interested Underwriters at Lloyd's, London, 680 F.3d at 66 (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)).  Any ambiguity is "strictly construed against the insurer." Id. at 27 (quoting Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012)).  We have observed that this interpretative rule "applies with particular force to exclusionary provisions." U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc., 797 F.3d 116, 120 (1st Cir. 2015) (quoting Boazova v. Safety Ins. Co., 968 N.E.2d 385, 390 (Mass. 2012)).  In construing such provisions, Massachusetts courts favor "the narrowest plausible interpretation." Performance Trans., Inc. v. Gen. Star Indem. Co., 983 F.3d 20, 25 (1st Cir. 2020).

The Insurers' argument does not advocate the narrowest possible interpretation of the failure-to-supply provisions.  The Insurers implicitly concede that Peterson's proffered interpretation -- that the provisions apply to a failure to provide an adequate quantity of fuel -- is plausible.  They argue only that the provisions should be read to apply to a more expansive category of losses that includes sub-standard fuel.

It is true that "adequately" can be plausibly construed as connoting both quality and quantity. See, e.g., Adequate, Black's Law Dictionary (12th ed. 2024) (defining "adequate" to mean "[f]ully satisfying requirements; sufficient, suitable, and acceptable in both quality and quantity"). But it is also true that "adequately" can be interpreted to cover either quantity or quality. See, e.g., "Adequately," Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/definition/english/ad equately (last accessed Aug. 19, 2025) (defining "adequately" to mean "in a way that is enough in quantity, or good enough in quality, for a particular purpose or need") (emphasis supplied). In other words, "adequately" or "adequate" are susceptible to multiple meanings. Thus, barring context clues showing that those terms are used here to describe both the quality and quantity of fuel to be supplied, the failure-to-supply provisions must be deemed ambiguous. See Dorchester Mut. Ins. Co. v. Miville, 204 N.E.3d 382, 388 (Mass. 2023) (resolving uncertainty created by disputed term's susceptibility to multiple interpretations by examining "the term's location within the policy").

The failure-to-supply provisions offer no such clarity. To the contrary, as Peterson's and the intervenors observe, "adequately" precedes "supply" and is therefore presumed to modify that verb -- not any of the listed products that follow. See Nielsen v. Preap, 586 U.S. 392, 403 (2019) (observing that "an

adverb cannot modify a noun"); cf. United States v. Jones, 471
F.3d 535, 539 (4th Cir. 2006) ("Adverbs generally modify verbs,
and the thought that they would typically modify the infinite
hereafters of statutory sentences would cause grammarians to
recoil."). The provision thus appears to focus principally on the
adequacy of the supply, i.e., Peterson's distribution of the listed
products, rather than the adequacy of the goods being supplied.
See Supply, Black's Law Dictionary (12th ed. 2024) (defining
"supply" to mean, inter alia, "[a] means of providing a constant
flow of something as needed, esp[ecially] with a system of
distribution or circulation; a system that is used for furnishing
some essential or important commodity," e.g., "the water supply
was cut off"). Had the Insurers intended to convey otherwise,
they could have incorporated "adequate" into an adjectival phrase
describing the enumerated products by rephrasing the provision to
cover a failure to "supply adequate gas, oil, electricity," etc.
See MacArthur v. Mass. Hosp. Serv., Inc., 180 N.E.2d 449, 451
(Mass. 1962) (rejecting insurer's proffered interpretation where
"it would have been an easy matter to state the provisions of the
section in dispute in form and words which would leave no doubt as
to its intent"). Their failure to do so means that it is possible
that the at-issue provisions were intended to capture only
Peterson's failure to deliver an adequate amount of oil -- a

shortcoming not implicated by the customer-plaintiffs' underlying complaint.

In short, "adequate" and "adequately" could mean only enough product or both enough product and product that was up to snuff. At best then, these words, as used in the failure-to-supply provisions, are "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." AIG Prop. Cas. Co., 892 F.3d at 27. The provisions are therefore ambiguous, and that ambiguity must be resolved against the Insurers. See id. On that basis, we affirm the district court's judgment that the failure-to-supply provisions do not apply to limit coverage for the underlying litigation.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Peterson's and denial of summary judgment for the Insurers is **affirmed**.